**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

UNITED STATES OF AMERICA,                    ) AU:21-CR-00203(1)-LY
                                             )
    Plaintiff,                               )
                                             )
v.                                           ) AUSTIN, TEXAS
                                             )
RYAN TAYLOR FAIRCLOTH,                        )
                                             )
    Defendant.                               ) OCTOBER 21, 2021

            *********************************************
                 TRANSCRIPT OF DETENTION HEARING
               BEFORE THE HONORABLE SUSAN HIGHTOWER
            *********************************************

APPEARANCES:

FOR THE PLAINTIFF:    G. KARTHIK SRINIVASAN
                      UNITED STATES ATTORNEY'S OFFICE
                      903 SAN JACINTO BOULEVARD, SUITE 334
                      AUSTIN, TEXAS 78701

FOR THE DEFENDANT:    SHAWN C. BROWN
                      ADRIAN FLORES
                      LAW OFFICE OF SHAWN C. BROWN, P.C.
                      540 SOUTH ST. MARY'S STREET
                      SAN ANTONIO, TEXAS 78205

TRANSCRIBER:          ARLINDA RODRIGUEZ, CSR
                      501 WEST 5TH STREET, SUITE 4152
                      AUSTIN, TEXAS 78701
                      (512) 391-8791

Proceedings recorded by electronic sound recording, transcript

produced by computer.

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

**EXHIBIT INDEX**

|  | OFFD/ADM |
| --- | --- | --- |
| Government | | |
| 1 | 4 | 10 |
| | | |
| Defendant | | |
| 1 | 25 | 25 |

(Proceedings began at 3:04 p.m.)

THE CLERK:  Court is now in session for a detention hearing, 21-CR-203, *United States v. Ryan Faircloth*.

MR. SRINIVASAN:  Good afternoon, Your Honor. Karthik Srinivasan for the government.

THE COURT:  Good afternoon, Mr. Srinivasan.

MR. BROWN:  Good afternoon, Your Honor.  Shawn Brown and Adrian Flores for Mr. Faircloth.

THE COURT:  Good afternoon, Mr. Brown and Mr. Flores.

So I mean to begin this afternoon by reminding counsel that, as required by Rule 5(f) that the -- the Federal Rules of Criminal Procedure -- excuse me -- the United States is ordered to produce all exculpatory evidence to the defendant pursuant to *Brady v. Maryland* and its progeny.  Not doing so in a timely manner may result in sanctions, including exclusion of evidence, adverse jury instructions, dismissal of charges, and contempt proceedings.

MR. SRINIVASAN:  Yes, Your Honor.

THE COURT:  Thank you, Mr. Srinivasan.  So with that said, this matter comes to the court on the request of the government for the detention of Mr. Faircloth pending trial, and how does the government intend to proceed today, Mr. Srinivasan?

MR. SRINIVASAN:  We intend to pursue the motion, Your Honor.

THE COURT:  Okay.  Thank you.  So you may begin.

MR. SRINIVASAN:  Yes, Your Honor.

MR. BROWN:  Your Honor?

THE COURT:  Yes.

MR. BROWN:  How do you feel about the mask and stuff?

THE COURT:  Oh.  Thank you for reminding me.  I was distracted by my Due Process Protection Act warning.  Anyone who is fully vaccinated is welcome to remove their mask. Anyone who is not needs to keep their mask on.  And, of course, anyone who chooses to is also welcome to remain masked at all times.  Thank you.

With that, Mr. Srinivasan, you may proceed with your evidence.

MR. SRINIVASAN:  Thank you, Your Honor.  I think before we get started, there's just a few preliminary matters for the Court.

First, the parties have agreed to admit Government's Exhibit 1, which is an interview video of the defendant that was taken on October 1st, 2021.  That's up on the screen over here.  The parties intend to play select clips from those.  I think we've identified those clips, so I think we can do so in an efficient manner.

We've also agreed to proceed by proffer.  I understand the defense will want to proffer some information from family.  We have information from the complaint and the

nature and circumstances of the offense that we'd want -- that we'd want to proffer.

Finally, Your Honor, I think we got word yesterday that the Court was considering closing the courtroom for a portion of this when the video clips were being played, and I didn't know if that was still the plan or if that was the Court's plan.

THE COURT:  If the motion was filed to submit the evidence under seal.

MR. SRINIVASAN:  Okay.

THE COURT:  And if there was any sealed evidence that would be played, then I would be closing the courtroom.  But now I understand, pursuant -- through Mr. Ferrell, that the government doesn't intend to play any evidence that needs to be played under seal; is that correct, Mr. Srinivasan?

MR. SRINIVASAN:  That's correct, Your Honor.  I think the clips that we would want to play -- and I don't want to speak for Mr. Brown.  But I think from the clips that I've seen that he submitted don't implicate the reasons for the seal, and I don't think that *[unintelligible]*.  It's not that different from having a document with victim PII that we redact in court, where that might be available to the jury but not available to the public.  And so we don't think a courtroom closure is necessary.  And, if the Court was intending to do one, I'd like an opportunity to make a record on that.

THE COURT:  Certainly.  And I'll ask Mr. Brown.  So you don't object to the Government's Exhibit 1?

MR. BROWN:  We don't, Your Honor.  We're going to be using it as well as part of our proffer.

THE COURT:  And is there anything further that you'd like to address with regard to sealing any of the evidence?

MR. BROWN:  No, Your Honor.  I think it was just for purposes of -- of the information that was not going to be -- there's some things that aren't going to be played in the courtroom today.

THE COURT:  Okay.  That sounds good, then.

Mr. Srinivasan, you may proceed.

MR. SRINIVASAN:  Thank you, Your Honor.  Thank you.

Your Honor, this is a -- this is a presumption case. Under 3142(e)(3)(C), an offense that is listed under 18 USC 2332b(g)(5)(B) with a 10-year maximum or more triggers the presumption.  And an arson charge under 844(i) triggers the presumption, Your Honor.

So there's a presumption -- a rebuttable presumption that there are no conditions or combination of conditions that ensure that the defendant is not a danger to the community or a flight risk.  And we -- we submit, Your Honor, based on the evidence and the argument that we're about to present, that the defendant cannot meet that burden.  It is a burden of production.  Ultimately, the burden of persuasion rests with

the government, of course.  We don't think that their -- that he has met or can meet his burden of production to show the presumption is overcome.

The -- the factors that the Court is required to consider under 3142 include the nature and circumstances of the offense, the weight of the evidence against the defendant, his history and characteristics, as well as the risk of danger that's being posed.

And so what I'd like to do, if it's okay with the Court, and I suspect Mr. Brown, too, is sort of a mix of the evidence and the argument.  In other words, we'd be presenting the proffering facts to the Court but then also playing the video in between that.  Is that okay, or would the Court that I just play the video right away?

THE COURT:  I have no problem with you mixing the proffer and the argument in this case.  Mr. Brown, is that acceptable to the defense?

MR. BROWN:  That's acceptable to the defense, Your Honor, as long as we're able to do the same.

THE COURT:  And you intend to proceed in the same manner?

MR. BROWN:  Yes.

THE COURT:  Okay.  Thank you.  As they often do in the detention hearing, sort of meld into each other.  So you can certainly present your evidence and proffer and argument

together.

MR. SRINIVASAN:  Thank you, Your Honor.

The evidence of guilt in this case, which is a factor under 3142, is overwhelming.  In the early morning hours on September 29th, the defendant went by the building at 1311 East 6th Street, Suite B, which happens to be the Travis County Democratic Party headquarters three times, Your Honor.  The first time he threw a rock through the window.  The second time, a few minutes later, he dropped a bottle that had gasoline and a wick in there, along with a smoke bomb.  It didn't light at that time.  A few minutes later, he comes back and drops what he described during the interview video as an artillery shell firework, Your Honor.  It's what we think as a mortar fire shell kind of perhaps you can put in a tube and it goes up and explodes in the sky.  But a pretty significant firework.  It was on fire, it was lit, and it was thrown in there.  And within seconds, Your Honor, the sparks from that, the flame from that, ignited the contents of that bottle and caused a fire inside that building, Your Honor.

The fact that he went back repeatedly, he went there three times, including one time after he initially dropped the bottle in there and did not light on fire, showed that he clearly had a malicious intent, an intent to start a fire in this case.  The evidence of that is overwhelming.

He also, Your Honor, got lucky in a way, because

there was a good Samaritan across the street who saw that there was a fire coming up and rushed over and used a fire extinguisher to put the fire out very, very quickly, Your Honor.  But he started -- he started that fire.  And starting a fire in the middle of the night, Your Honor, is not something that is -- that is risk-free or shows the nonintent to harm people.  First responders have to respond to that fire.

If that -- if that good Samaritan had not been there to put that fire out, there would be firefighters, police officers, other first responders who potentially would have to put themselves at risk to fight the fire that that defendant had started, Your Honor.  It was not a risk-free exercise that was done in the middle of the night when no one was there, so no harm, no foul.

He also, Your Honor, as we'll get to, I mean, he admitted to the conduct and claimed that he was trying to send a message with his conduct.  And that was his intent, send a message.

As I mentioned, Government's Exhibit 1 is a video.  We think that it is a video of the interview, and we'd like to play about six clips from it.  And that's additional evidence that he cannot meet his burden of showing that he's not a danger to the community or a flight risk.  And so I'll play the clips and then --

THE COURT:  And let me just ask Mr. Ferrell, I think

we'll be able to see it a little better if you can lower the --
I usually like to have the shades up, but I think we'll go
ahead and lower them and then we can see the video better.
Thank you.

THE COURT: Thank you.  Mr. Srinivasan, please proceed.  And
thank you, Mr. Ferrell.

MR. SRINIVASAN:  Thank you, Your Honor.  And, for
identification, this is Government's Exhibit Number 1, and I
intend to play minute 12 through 12:55 for this clip.

(Video played)

MR. SRINIVASAN:  And start that over.

THE COURT:  Why don't you start over.  And I think I
didn't mention before, since there's no objection from
Mr. Brown, Government's Exhibit 1 is admitted.

MR. BROWN:  Judge, we just ask that it be admitted
for the purposes of this hearing.

THE COURT:  Yes.  Granted.

(Video played)

THE COURT:  I'm sorry.  I cannot hear that.  Is that
audio coming out from your computer or somewhere else?

MR. SRINIVASAN:  No.  It's coming from here.  My
audio is all the way up.  I don't know if there's a way to turn
it up on the system?

THE COURT:  I'll ask Mr. Ferrell.  If it's not coming
from your computer, I was going to say we could put a

microphone by it.  But, otherwise, I think it's -- let's see if Mr. Ferrell can do anything with the audio.  I just can't quite hear.

(Video played)

MR. SRINIVASAN:  That ends at 12:55 in the video.

The next clip, Your Honor, is Government's Exhibit 1, minute 13:26 through 14:27.

(Video played)

MR. SRINIVASAN:  The next clip, Your Honor, is minute 16:05 through 16:52.

(Video played)

MR. SRINIVASAN:  I think we went a little bit too far.  That was supposed to end at 16:52, Your Honor.

So, Your Honor, I think these initial clips show the strength of the evidence against the defendant.  And I think it shows that his intention is planning and conducting this criminal act.  He describes clearly to the agents how he did it.  He had the materials just lying around, a wine bottle from his business, a sock, he had gasoline from his generator.  He made the decision.  He created the device at the storage unit, transported it all the way to the location where he conducted the crime, Your Honor.  It was an intentional crime that he took, and an attack he took against that building.

The next clips I think get to the defendant's -- additionally to the defendant's state of mind as well as some

of the reasons why we think that he cannot meet his burden in this case.  So I'll talk about that.

For identification, this is minute 24:28 through 25.

(Video played)

MR. SRINIVASAN:  The next clip is minute 36:40 through 38:38.

(Video played)

THE COURT:  This one I really can't hear at all.

MR. SRINIVASAN:  I am at 125 percent on my volume.

(Video played)

And then the last clip is minute 54:35 through 55:08.

(Video played)

MR. SRINIVASAN:  Thank you, Your Honor.  That's the last clip that we would play at this point.

We submit the Court should take the following from this to show why the defendant should be detained in this case:

He made a decision that night without warning to construct this Molotov cocktail and then use it, Your Honor.  He made the decision so quickly.  I think he was at the storage unit around midnight.  He says the attack happens roughly around 2:00 a.m., your Honor.  That is a very, very fast fuse when you make an impulsive decision.

And it wasn't just an impulsive decision in the moment.  It was an impulsive decision followed by planning, by constructing a device, by finding a place to use that device,

Your Honor.  It shows that he is capable of those kinds of actions and taking those kinds of actions very quickly and without warning, because he did it in this instance.

And it wasn't an accident or a temporary lapse in judgment, Your Honor.  His grievances have been accumulating for a while, and he moved very, very quickly once he was ready to make that decision.

He also, you know, admitted that whether people had been there or not would not have made a difference.  You know, common sense would tell him not do it when there were people in front of the building.  I think the Court can infer that means that when people -- when you're going to get caught, Your Honor.  That when people are there and can see you and you're doing this action, Your Honor.

But note, Your Honor, he did this to send a message about his political, social, or cultural grievances, so he attacked a building where I guess the people are, quote/unquote, brainwashed.  Brainwashed, Your Honor.  It's a dehumanizing way to think about these people, and it's easier to attack an institution or attack a people who have a certain sort of belief system and send them a message using this kind of action, Your Honor.

And it is -- when you take that kind of action and don't see those people as, sort of, individuals, but as the brainwashed or when he says that he saw them as "the group" and

made that, I think, hand gesture in the video, I think it's easier and much more risky to have this defendant out there. And, in his words, he wasn't fazed at the time. He wasn't phased at the time that he did this. It was when he got up and saw it on Facebook that he said, Oh, boy, this is big news, Your Honor. It didn't faze him at the time.

And I think that with that sort of, I mean, demonstrated potential for taking this impulsive behavior and acting on -- you know, carrying out an act of violence when his grievances reach a certain point, Your Honor, that's a risk that the Court I think shouldn't take.

And also, Your Honor, I think that he has every incentive to flee and that any condition or combination of conditions is unlikely to keep him here and keep him coming to court and not be a danger. He's facing substantial jail time.

This is a crime with five-year mandatory minimum sentence, Your Honor. And if he's convicted and the district court finds that certain enhancements apply, his penalties could go up to a guidelines range of 151 to 188 months, which is our -- which is our estimate if those enhancements apply. That's a substantial amount of punishment. And so he has every insensitive to flee and not come back to court to answer for his crimes because he's facing significant time.

He has a mobile bartending service, which I think the Court heard a little bit about in this video clip. If he goes

back to work, Your Honor, he's going to be all over the place. It's going to be very difficult for pretrial to monitor him for his activities -- you know, for everyone to keep tabs on his activities and make sure he's not a danger to the community. He's going to be out in the community all the time, you know, for his job.

And the weapon that he constructed is simple, and it was made from materials that were just lying around. It didn't take any special effort on his part. He had to find a bottle, he had to find gasoline, and he had to find a sock to do this. It's going to be impossible, I think, for pretrial to sort of monitor his activities and ensure that he's not a danger to the community in a situation like this.

I understand the pretrial services office has recommended bond, Your Honor, but they didn't have all of this evidence in front of them which I would ask you to consider in addition to their recommendation, obviously.

Your Honor, we think that the defendant poses a danger to the community as well as a risk of flight. It is his burden to show that he is not, and we don't think that he has.

Thank you.

THE COURT:  Thank you, Mr. Srinivasan.

Mr. Brown?

MR. BROWN:  Good afternoon, Your Honor.  May I proceed?

THE COURT: You may.

MR. BROWN: Thank you. Judge, just a couple of things. We -- we tendered to the Court I believe this morning three letters of proffer from witnesses. There was no objection from the government for the Court to review them.

MR. SRINIVASAN: That's correct, Your Honor.

MR. BROWN: I'd just like to touch on those real quick before I get into the video.

First and foremost, Alexandrea Lexi Morris, who is Mr. Faircloth's sister, I think she lays out who Mr. Faircloth is as a person. Gives a little background about who he is concerning growing up in San Antonio, going to Catholic school, being involved in a bunch of different organizations, very athletic, was part of programs such as the Big Brother Big Sister that made a big impact on people's lives growing up. And, again, talking about the different companies that he has not only worked for but started on his own. And we'll get into that in just a minute.

But, as the government mentioned, he does own his own company. It's a -- he's a vendor of sorts. It started off as a mobile bartending business that has kind of morphed into hosting private functions for businesses, families, and the like. Mr. Faircloth started this from the ground up and has done very well with it.

It indicates that he's caring, loving, has always

been for her, and she indicates that he has expressed remorse and so forth concerning the allegations against him.

If we turn to the second statement, which is Elizabeth Mondy, who is his girlfriend, they've lived together -- or they lived together for several years. Again, she talks about who Ryan is. And it's a common theme, how he's passionate about his work, how he helps people, specifically, that he's not violent in nature. I thought that was important, that she indicated that he is not violent.

Both, Lexi and Elizabeth indicated that they were surprised and shocked to learn about these allegations and Ryan being involved with them.

Lastly, his mother, Kara Morris, who he has lived with throughout the years, gives a little background about her. She talks about an altercation which is contained in the PSI -- or the pretrial report about an assault case. She goes to visit him when he's locked up on these charges and was shocked to learn that there was not only charges pending but also a protective order. She didn't talk to anyone about it. There is no evidence that this happened.

In fact, on the video itself, when they interview Mr. Faircloth, he talks about with the agents at length talking about how he -- his -- it got escalated, and so he chose to leave the situation. And he said he didn't want to press charges on his mother but that she had assaulted him and was

hitting on him, and so he left to avoid any altercations there at the house. And that's when he ended up going to his storage unit.

So I wanted to address that because I know it's in the pretrial report. There was -- no one ever talked to the mom about it. You can see in her statement no one talked to her, nobody mentioned it to her. She didn't know that any of this was going on until she goes to visit him at the jail with a pre-approved scheduled visitation.

Again, she talks about his involvement with different things without -- throughout the community, things he was involved with with sports, and, again, how this was completely out of character for Ryan.

Ms. Betty Mansfield is Mr. Faircloth's grandmother. She's here in the courtroom today. She doesn't have the ability to write a statement, so she actually rode up here with me, and we discussed and I told the government that I was going to proffer what she would testify to. And they didn't have any objection to it.

She actually -- Ryan lived with her his senior year in high school. I believe this is who pretrial recommended that Mr. Faircloth live with in the event that he is granted release. She lives in San Antonio, has been a lifelong resident there, a schoolteacher. She's 81 years old. She cares for Ryan greatly. Obviously, it's her grandson, her only

grandson.

But, more than that, when Ryan has parties and so forth to do in the San Antonio area, she told me on the way up here that he's considered her caregiver and he makes sure that she has the groceries she needs, runs her on her errands when he comes to town, helps her do the yard, takes her to doctors appointments, helps her with her groceries.

And she has agreed through pretrial that she would allow Ryan to live with her and make sure that he appears at all court appearances and make sure that he follows any and all rules that the Court would assess as a condition of pretrial release.

In the event that she needs to it and would make the Court feel more comfortable, she has agreed to cosign in the event that the Court would feel more comfortable having a cosigner on the recommendation from pretrial.

THE COURT:  I'm sorry.  Was this Mr. Faircloth's mother or grandmother?

MR. BROWN:  Grandmother.  She's right here.

THE COURT:  Grandmother is willing to cosign.

MR. BROWN:  Yes.  And she's here present, and she's already been interviewed by pretrial, Mr. Cisneros.  And I think he interviewed her for the purposes of living at her house.  But, in the event that the Court would like a cosigner on the bond, she'd be more than willing and happy to do so.

And I think that would address the argument by the government concerning whether or not he would flee. He has no reason to flee, Judge. He has no prior criminal history. He's never been in any trouble before. There's other cases pending. There are state charges out of the same transaction concerning this particular case. They took him to the Travis County jail, he was arrested there, and at a later time the federal charges were filed.

Concerning the statement -- and, as the Court knows, under 3142(g), there's a laundry list of things that the Court needs to review and take into consideration as to whether or not he would be a flight risk or danger to the community. The nature and circumstances of the offense, obviously, the weight of evidence, other history and characteristics of the person being charged, ties to the community, other factors, whether or not he was on parole or probation when this case transpired, and then other factors that I'm going to get into.

What I would like to do is play a few clips for the Court as well from the same Government's Exhibit Number 1. Unfortunately, I gave the government times that are stamped on there and not the actual minutes of it playing, and so I just hope that -- he sent me an e-mail saying, okay, I think I got it, so --

THE COURT: You can work it out.

MR. BROWN: -- I'm going to try to go off of that.

THE COURT:  Before we do that, I just want to verify Ms. Morris is not here today, correct?

MR. BROWN:  She is not here, Judge, and that's why she wrote the letter, because she wanted to be here.  Because of the protective order in place, she couldn't be here.

THE COURT:  Well, and understanding that that case, I assume, is pending.  It's one of the ones referred to as pending currently?

MR. BROWN:  That's correct.

THE COURT:  There's quite a disconnect between the affidavit in that case and the letter that she wrote.  It is very specific and very troubling in the way that he attacked her.  So if there's anything further you'd like to speak to that, that's a very significant concern of mine.

MR. BROWN:  Sure.  And there's a statement that he talks to the agents when he's being interviewed for over an hour, they discuss that specifically.  And what you've referred to as an affidavit is the affidavit of arrest from the police officer?

THE COURT:  Yes.

MR. BROWN:  Okay.  The police officer never spoke to her.  As you can see from her letter, she was never interviewed, she was never spoken to.  So it was news to her when she went to visit him at the Travis County jail that there were even charges pending, that there was a protective order.

THE COURT:  See, that's part of my problem, because this affidavit says quite plainly that the officer spoke to Ms. Morris.

MR. BROWN:  Okay.  Judge, there is -- go ahead.  I'm sorry.

MR. SRINIVASAN:  Your Honor, this is my understanding of the sequence of events, is that -- my understanding is that the defendant's mother spoke with the case agent on our case.  He is a task force officer with the FBI Joint Terrorism Task Force, but also an APD Officer.  His name is Ryan Metcalf.  He wrote up a report because I think that's part of the APD policy.  And then my understanding is there is another detective who then took the report and then had the charges filed, swore an affidavit, and had the protective order put in place, Your Honor.

The reason that I did not emphasize this during my presentation, Your Honor, is that my understanding is that, you know, Ms. Morris may dispute some of these facts and what actually went in there.  I'm not sure how -- how much investigation the arresting officer as opposed to -- to distinguish between the case agent and the arresting officer -- did on this, Your Honor.

So there may be -- there may be more there.  It might be a complicated family situation, Your Honor.  But I'm just -- I'm not comfortable enough with the facts to tell you exactly

what happened in that situation and how that all went down.  So that I think is what we're talking about in this situation.

THE COURT:  Well, I appreciate that Mr. Srinivasan, because here we have someone with no criminal -- no prior criminal arrests for any kind of violence in the past, particularly including domestic violence, and so that is a very significant concern to me.  And if it -- it sounds as though do you agree or do you have further points to make on that, Mr. Brown, that Ms. Morris is disputing the validity of that affidavit --

MR. BROWN:  She --

THE COURT:  -- or the accuracy at least?

MR. BROWN:  Yes.  I mean, no one has seen the affidavit, Judge.  We haven't seen the arrest affidavit concerning this assault case.  When she told me about it, she told me she was going to put it in her statement specifically.  And where it says, "I am aware there were assault charges filed on my behalf along with a protective order.  However, I was never informed about either."  She was told when she showed up.  So she was just as surprised of the rest of us to find out that this had happened.

There was talk about it on the interview.  I think the government would agree that Mr. Faircloth talks to them about it and says "My mom and I got in an altercation.  I left.  She was beating on me."  And I think that that's a fair

rendition as to what he talked to the agents about during the interview, specifically talking about this.

THE COURT:  And this affidavit is sealed.  Is that why Ms. Morris and the defense team has not seen it yet?

MR. BROWN:  I haven't seen an affidavit on the assault, Judge, at all.  I've seen the State's arson charges, but I have not seen anything concerning the affidavit concerning the assault.

THE COURT:  Mr. Srinivasan, do you have any further information?  It's a State affidavit.

MR. SRINIVASAN:  Yeah.  I don't know if it's sealed, Your Honor.  I don't know the answer to that.

THE COURT:  It's, in fact, Austin Municipal Court rather than State of Texas, but ...

MR. BRUSH:  Okay.

THE COURT:  Okay.

MR. BROWN:  And so, Judge, again, he obviously denies it.  There's no evidence to support that.  The evidence that we do have before the Court is the supposed complainant saying she didn't file charges, she was just as shocked as anybody else to learn of a protective order or an assault case being filed.

THE COURT:  Okay.  Well, I -- I appreciate the explanation for the two of -- from the two of you.  And I don't know if you move them into evidence for purpose of this hearing, the defendant's -- defendant's exhibits -- Exhibit 1

with the three letters.  Did you so move, Mr. Brown?

MR. BROWN:  Yes.  We'd move those into evidence, Your Honor.

THE COURT:  Any objection, Mr. Srinivasan?

MR. SRINIVASAN:  No, Your Honor.

THE COURT:  They're admitted.  And, with that, I think we're ready proceed as you had intended to with playing portions of the video.

MR. BROWN:  Sure, Judge.  The first one is at 4:31 -- I'm sorry.  I have it at 4:31, which is the actual time stamp on it, 4:31 p.m.  And just if we could let it run for about 10 seconds or so.

MR. SRINIVASAN:  Your Honor, what I'd like to do is also, just to make the record consistent, I'll tell you the time stamps also.  So I think this is what Mr. Brown identifies as 4:31 is 53 seconds to about 1 minute, 3 seconds in the video.

THE COURT:  Thank you.

(Video played)

MR. BROWN:  And, Judge, the purpose of that is to show that the agents were agreeable to take off the handcuffs. He was not a danger to them.  He didn't pose a danger.  He was cooperative, he was polite, he was respectful, which would support the letters that we've just admitted into evidence as to Mr. Faircloth's demeanor, his characteristics as a person

and so forth.  If he -- if they felt he was a danger to them or anybody else, I do not think that they would have taken his handcuffs off.  In fact, they took them off and left them off throughout the entire process of the interview.

Next, number two.  And I'm sorry.  I don't have the minutes.

MR. SRINIVASAN:  That's okay.  It's -- the time stamp I think is 7:48 through 8 minutes and 51 seconds.

THE COURT:  Thank you.

(Video played)

MR. BROWN:  Okay, Judge.  Then this goes to what we were talking about, him and his mom having the argument, him leaving to remove himself from the situation, and going to the storage unit.  And they talk about that's his cool-off place, again, showing that he's not violent in nature.  He wasn't sticking around to fight with his mom or assault his mom or anything of that nature.

And I think this establishes the fact that he removed himself from the situation and goes to the storage unit to where he can get away and get away from what he talks about to the agents, where his mom was actually assaulting him and he pulled himself out and took himself to the storage unit. Again, this would show that he is not violent in nature and that he is removing himself from the situation.

MR. BROWN:  Okay.  Number 3.

MR. SRINIVASAN:  Next one?  Okay.  The time stamp on the next clip is 12 minutes and 2 seconds through 12 minutes and 47 seconds.

(Video played)

MR. BROWN:  Stop it right there.

MR. SRINIVASAN:  Okay.

MR. BRUSH:  Judge, the first thing to say, "What were you planning to do?"

"I did not want to hurt anybody."

That clearly shows that he is not a danger to the community.  He was not trying to hurt anybody.  And I know the government talked about, well, if people were there, obviously, he wouldn't have done it.  Throughout this entire interview, he talks about "I don't want to hurt anyone," "I did not want to hurt anyone."  And I think that clearly shows that he was -- he's not a danger to the community, in the fact that he's not trying to hurt any individual person and he's making sure that nobody was there.  He even goes on to say -- and we'll hear it in just a second, that's why I did it at night, because nobody was there and nobody would get hurt.

(Video played)

MR. BROWN:  Okay.  And, Judge, again this is throughout the interview as well, talking about the Molotov cocktail.  Yes, he did make it, and he goes and sets it over there.  He didn't light it.  He didn't light the wick.  He

merely set it inside the window. What was used and what the government is talking about -- and you'll hear it on his interview -- is he had some fireworks leftover at his storage unit. And it's a firework that you put and it shoots up in the air and it makes all the pretty colors in the sky on 4th of July. That's what he used. That's what was lit.

And specifically in the arson report from the Austin PD, it says the only thing that was lit that they found there was the firecracker. It still had the paper on it. The Molotov cocktail was not lit. The wick was not lit. The only thing that was lit was the firework. And this is contained on the arson report on page 17.

(Video played)

MR. BROWN: And, again, Judge that's what I was just talking to the Court about, is it was a firework. It wasn't his intention to take the Molotov cocktail. If it was and lit it, throw it, and burn the building down, he very easily could have done that. That was not his intention. It's littered throughout this interview with these detectives and agents concerning this. They ask him numerous times. It's contained through their written report through the Arson PD report, you know, "What was your intention?"

"I didn't want to hurt anybody. That was -- I did not want anyone to get hurt. I never lit the Molotov cocktail."

The arson investigator himself says the only thing that was lit was the firework that was just described to the Court through this interview.

Again, showing that he's not a danger to the community. He's not putting people at risk. He -- he took that into consideration. You heard him. It was like a smoke bomb. He wanted the smoke to get the effect. It wasn't to burn the building down or anything of that nature.

MR. SRINIVASAN: Next one?

MR. BROWN: Yes. Thank you.

MR. SRINIVASAN: This is -- the time stamp is minute 18:31 to 18:41.

THE COURT: Thank you.

MR. BROWN: 18:40?

MR. SRINIVASAN: 18:31 to 18:41.

(Video played)

MR. BROWN: Judge, this would show that he wasn't planning or scheming. The agents did -- they've gotten all his electronic devices, his iPad, his computer, his phones, to see if this was a planned deal. This was not something that he had been premeditated to do for -- for months on end or anything of that nature. He told them there's no evidence to support otherwise. He made that decision two hours before.

The -- it was not premeditated. The government has searched his house, searched his vehicle, searched his phones.

I know they're talking about a weapon or the -- the Molotov cocktail.  There was never any guns found.  There was never any knives found.  There's no evidence that he uses guns or knives or has any in his possession that would indicate that he's a danger to the community or he's likely to go out and do something to harm people in this community.

I think you can hear that -- and it's littered throughout this interview that he didn't want to hurt anybody.

MR. SRINIVASAN:  The next one is, let's see, minute 25:40 through 30:29.

(Video played)

MR. BROWN:  Judge, this five-minute part of the interview concerning who he is, what he did for a living, and so forth.  And, as I mentioned to the Court, he runs a service company throughout the state of Texas.

And I know the government said, oh, he's going to be going here and there and there's no way we can decide where he's going to be or monitor him or whatever.  There's numerous ways of going about doing that.  And there's trackers, there's GPS, there's making sure that he gets approval from pretrial.

Pretrial, when they wrote their report, new exactly what he did.  He told them.  It's in their report, where he was going from city to city and doing functions throughout the state of Texas.  And pretrial recommended that he be released on bond or pretrial release.  And, if the Court has any

concerns whatsoever, there's numerous things that the Court could add as a condition: again, that GPS or tracking or restrict to certain areas, or whatever the case may be, or even a curfew or whatever the Court would feel is necessary to make sure that he abides by the rules.

You heard he started this company, he's a productive member of society.  He has ties to the community.  He works in the different communities in and around Austin and San Antonio. It shows who he is.  He has a job.  He's going to be here. He's not going anywhere.  He's not going to flee, he's not going to run, and there's no evidence to support that he would.

THE COURT:  Now, let me just ask, Mr. Brown, do you have any suggestions, given that the nature of this business is to travel across the state, and I would imagine the events occur at night.  So some of the things that you mentioned don't really work, do they, to say limit it -- if he keeps his current job, limit him to certain areas or to certain curfew. Do you have any suggestions --

MR. BROWN:  Sure.

THE COURT:  -- that you think would be effective?

MR. BROWN:  Sure, Judge.  He has people that could help him.  So if they're in a city that the Court would feel uncomfortable him going to, if he had to stay in San Antonio and run the events in San Antonio where he's living -- where he would be living with his grandmother, and his girlfriend

actually lives in Houston, she could handle that.  As you can see in the letter, she does assist him with his work.  He could hire somebody in the Austin area to cover the events there.  So there is absolutely ways to go about doing that.

THE COURT:  That's what I was looking for your help with, because, as you understand, our pretrial services officers are very busy and have a large case load.  And it's just not feasible to say that they're going to get a request from him every time he has a job or they'll have to bring it to me.  That's not something that would be workable.  So that's why I'm asking you for your suggestions for ways that he could remain supporting himself and address Mr. Srinivasan's concern, at least in part, with regard to flight risk.

MR. BROWN:  Sure.  And that can be done, like I said, with his girlfriend.  She lives in Houston, and she helped him run the business there.  So she would be able to handle and maintain anything going on there.  He could handle the ones in San Antonio.  And, if he needed to hire somebody up here, he's got a lot of contacts in the industry.  Whether they're bartenders or people who set things up, he would be able to communicate via phone, e-mail, text, or whatever the case may be.

THE COURT:  Okay.  But the girlfriend, that's Ms. Mondy, correct?  She wrote the letter.

MR. BROWN:  That has correct.  Elizabeth Mondy.

THE COURT:  She's 22 years old, and she's not here either?

MR. BROWN:  She's not, Judge.  She's in Houston.  And the government agreed to allow her to write the letter via proffer.

THE COURT:  That's right.  But that doesn't permit me to ask her questions about what kind of supervision this very young person who lives in another city may be able to exercise over the defendant.

MR. BROWN:  Sure.  And if -- if it's not her -- I'm speaking out loud -- there's other people that he has contacts with.  He didn't just start this business.  He's been in the industry for four years now.  He has contacts in every avenue, as far as whether it's bartenders.  Even in the interview, they say, well, are you -- he said, I'm a one-man show.  However, when there's larger events and venues and so forth, I hire people.  I hire bartenders to go out.  I hire servers to go out.  I get the valets to do this.

And that's very easily done, thank God, with technology these days.  He can do it from San Antonio, he can do it from his grandmother's house, and he can handle whatever comes through in San Antonio.  And with a curfew, okay, he goes and sets up.  He has somebody else go break down.  So those issues can be easily addressed and -- through his business and his contacts.  From doing it for four years, he would be able

to make sure that he's able to maintain that.

THE COURT:  And you can proceed with your argument, then.  That addressed my question.

MR. BROWN:  Thank you.  Okay.  The next one?

MR. SRINIVASAN:  This is minute 48:13 through 48:35.

MR. BROWN:  I'm sorry.  What was that again?

MR. SRINIVASAN:  48:13 through 48:35.

(Video played)

MR. BROWN:  Again, Judge, the question was posed to Mr. Faircloth:  "What would you say to the people who work there who might be in fear to go there and work now, because you know, this happened in the middle of the night?"

He says, "You know, I would tell them I'm sorry.  My beef's not with them.  It's with other people."  Again, showing remorse --

THE COURT:  I believe, in fact, he said "My battle is with the higher-ups."  Isn't that what he said?

MR. BROWN:  Yeah.  My beef, my battle, is with the higher-ups, right, not with the people who work there.

And so, again showing remorse, telling them I'm sorry.  Again, this is another instance of where he -- you know, I believe he's not a danger to the community because he's apologizing if he did scare them, because that's not what his intentions were.  He wasn't trying to scare the people of the community, the people who were working there.

MR. SRINIVASAN:  And the last clip, I believe, minute 54:37 through 54:50.

(Video played)

MR. BROWN:  Again, him saying, "Look, if could go back and tell them I'm sorry for the people who work there, putting fear in their workplace," again shows remorse, that he didn't intend on hurting anyone or scaring anyone in the community.  Again, showing remorse.  As I told the Court in the beginning, this interview is littered with those types of things, where he's sorry, he's remorseful, he didn't want to hurt anyone.

I pulled up the -- the Austin arson investigation, and the notes throughout there, it's listed three or four times where he says, you know, I'm sorry.  I didn't want to hurt anyone.  That's why I did it at night.  I didn't want to hurt anyone.  That's why I didn't light the Molotov cocktail. That's why I didn't use it.

And, again, in the report it specifically says the only competent ignition source identified in the area of the origin of the commercial-grade fireworks ignited by an open-flame device.  And so the Molotov cocktail was never used. It wasn't intended on being used.  In the interview I think that we heard he said, you know, I did it just to scare.  It wasn't anything -- I didn't intend on lighting the wick.  He never lit the wick.  So he -- that was not his intention.

Although this case revolves around using a -- a device to -- an explosive device, littered throughout this interview he completely says that he was not -- he didn't intend on using it, he was not going to use it, he didn't light it. The report indicates that it was not lit, the wick wasn't lit. The only thing that was used was the firework that he talked about in the interview.

That's all I have for the clips, Judge. And as far as making an argument, do you want us to make the argument now?

THE COURT: Certainly. I think we agreed that Mr. Srinivasan combined his argument with his proffer, and you can certainly do the same, Mr. Brown.

MR. BROWN: Okay. Going through 18 USC 3142(g), the different factors that this Court needs to consider when looking at granting pretrial release in this particular matter, the nature and circumstances of the offense being charged. They're alleging an explosive, a Molotov cocktail, is what the allegations are.

I think we have shown through the video with the interview that Mr. Faircloth did not intend to use it. I think it was shown with the agents when he said "I didn't light it. I didn't use it." They agreed, they concurred, it was never lit. I read an excerpt from the Austin PD arson investigation where the only thing that was lit was the firework that was used. The wick was not burned. He didn't light it and throw

it at the building and cause a big explosion or anything of that nature. So the Molotov cocktail was never ignited.

The estimated damage in this particular case is about $1,000. What happened was, is when that firework went off, a spark lit. I think there was a stack of mail by the front door and it caught fire, and that's what the fire extinguisher was used to put out. And I think there was -- it didn't go into great detail, but about $1,000 worth of damage.

Nobody was injured. There was nobody there at the location. And we've heard, you know, through out this interview that we've played for the Court that that -- you know, that was very specific.

The weight of the evidence against the person, obviously, he gave an over hour interview with the agents in this particular case. He was read his rights. He understood his rights. He sat down with them. He was very truthful. He was very remorseful. He was very honest. He told them exactly what happened from the time that he got to his unit until he got to the building until he got home.

And littered throughout there, again, he says several times "I didn't want to hurt anyone." He says several times "I'm sorry." Again, this would show, "I don't want to hurt anyone," "I'm not going to hurt anyone," he's not a danger to the community. Those were not his intentions. He did not go out there to hurt anybody. He did not go out -- he

specifically said, "I did it at night because I knew nobody was there."

As the Court mentioned earlier, he has no assaultive behavior on his criminal record.  There is no indication that he's ever been -- possessed a firearm or a knife or ever had a fight or anything of that nature.  That's just not the person that he is, and I think his interview and the letters that we've provided to the Court establish that.

History and characteristics of the person.  His character, the letters indicate he's a good person.  You know, they all said that they were surprised that he was being charged with this crime.  It was out of character for Ryan, who he is as a person and who they know.  He's a hard worker.  I think the Court saw the five minutes about -- talking about his business, how he set it up, how he worked hard to establish it and the things that he did.  Again, they indicate he's not violent in nature.

Physical and mental condition.  According to the report of pretrial, there is no issues there.  Nobody -- we're not aware of any physical or medical limitations with Mr. Faircloth.

Family ties, ties to the community.  Obviously, his grandmother is here on his behalf and has agreed, after talking to pretrial, to allow Mr. Faircloth to live with her in San Antonio.  He is -- his sister is from the Houston area, and

she couldn't be here.  The letter, Lexi, she is a nursing student in Mississippi hoping to finish and come back.

There's no evidence that he has ties to Mexico or anywhere else.  His ties are here, his job is here, his family is here, and he's not going anywhere.  I know the Court questioned about is there something that we can fashion to make sure that he could still be working but yet follow the rules of GPS or whatever the case may be.

And I feel confident, according to the pretrial report and with the other recommendations that I've made in court today, the GPS, put him on a curfew, have him report weekly, whatever the case may be, and he can run his business from San Antonio.  I think that's clear.

He has jobs in the San Antonio area.  If he gets one out of town, he has to make a decision on if he can find somebody to handle that for him, you know, through his contacts, which he has four years of contacts with all the different vendors and so forth in that arena.  And I feel confident not only could he do it, but he would do it and he would follow each and every rule that the Court would impose on him.

Employment.  I've discussed this.  We played it on the video.  He's self-employed.  He started this company from the ground up.  He still has an opportunity to continue working it and running it.  In the event he should get pretrial

release, I feel confident he can do that from San Antonio.

Again, community ties, his business is here, his grandmother is here who he cares a lot about. And he -- you know, as she indicated, is basically her caregiver and would allow him to continue to care for her in the meantime, until this case is resolved.

Criminal history. He has no prior criminal history. I know he has cases pending. They're coming out of this incident, the arson and then also the assault, which we've discussed that with the Court. And I believe that, you know, we're all just as surprised as anybody else that that's even pending.

Record concerning court appearances. There is no record because he's never had to go to court. I feel confident in meeting with him and his grandmother, driving her up here, that anytime he has court that he's going to show up in court. He's going to be here on time. That's part of the business owner in him. He wouldn't be able to start a business from the ground up if he wasn't punctual and he didn't take care of his business.

He knows that he's looking at some time in this particular case. He's not going anywhere. He's going to be here and he's going to answer and he understands that. There's been no evidence presented that he is not going to show up or that he is an absolute flight risk other than, because he has a

five-year mandatory minimum. And that's -- you know, I think we've overcome that presumption.

Whether or not he was on probation or parole or anything else or other pending cases when he was released on -- or when he was arrested on this case, yes, he was. But that was because it was out of the same transaction. He's not on parole. He's not on probation. He didn't have any other cases pending other than the factual cases with this state case that's related.

Other factors the Court could -- you could impose. We discussed the GPS. Grandmother Betty Manfield has agreed to cosign. She owns her house. If the court felt like they needed to put it up as collateral, I feel confident that she would do it with my discussions with her. Ryan is not going to flee so his grandmother loses her house or has to pay whatever the amount this Court would order as a -- as a surety or as a bond amount, if the Court feels 10,000 is too low, we can -- you know, the Court could increase that amount.

Again, Ms. Betty Manfield, his grandmother, would clearly and gladly sign as a cosigner. That's how confident she is in him showing up to court and doing what he's required and is necessary to satisfy those conditions.

And, Judge, I think we've met our burden on this particular case. I think we've shown that he's not a danger to the community. I think we've shown he is not a flight risk and

that he will appear.  And I think we have given the Court options for additional conditions or conditions that would ensure the safety of the community and that Mr. Faircloth would appear in court.  Thank you.

THE COURT:  Thank you, Mr. Brown.

Mr. Srinivasan, anything further?

MR. SRINIVASAN:  Yes, Your Honor.  Just briefly to respond to a few points.  Your Honor, the flash-to-bang in this case was two hours.  He had this altercation with his mother, goes to the storage unit around midnight which you saw in the video, makes a decision that he is going to carry out this crime to "send a message," constructs the weapon using materials that were just around him, and then goes and carries it out.  Two hours, Your Honor.  That's not enough time for law enforcement, let alone pretrial, to stop something from happening the next time there is a stress in his life that causes him to lash out and attack others.

And that could happen, Your Honor.  It's a risk that's demonstrated in this case.  I think the Court should give significant weight to his actual actions in this case, Your Honor.  He may say over and over again, I didn't intend to start a fire, I didn't intend to do this, but the Court should look to actions and not just simply the words when he is facing significant criminal consequences and sitting in front of criminal investigators asking him questions like this in an

interview.

He went back.  He went to the door three times, first for the rock, second to drop a smoke bomb and the Molotov cocktail inside, and the third time to drop a firecracker, an artillery shell firecracker in there, Your Honor.

But I think everybody knows you don't smoke in a gas station, right?  And the reason is there's a serious risk of fire.  The only explanation for his going back that third time is an intent to start a fire and cause damage to that building.  And he got lucky.  He got lucky that that fire did not spread and did not get bigger, that it didn't cause firefighters to respond, police officers, first responders, whomever else who would be needed to put that out, Your Honor.

And so I think that what you're hearing is a lot of minimizing the consequences of those actions, of his intent, Your Honor.  And it shows, I think, the lack of appreciation for the seriousness of what actually happened in this instance.  And given the weight of -- given the nature and circumstances of that offense and the weight of the evidence, the Court should give significant weight to that.

I think also in response to some points that Mr. Brown, you know, was making, you know, in terms of a plan for his business, Your Honor, I think what we heard was a lot of "ifs."  If Mr. Mondy agrees to do this, that, and the third thing, then, you know, his business in Houston can survive.  If

this, if this, if this, Your Honor.

I think -- Ms. Mondy's statement doesn't say that she's going to -- she has a job. She doesn't say that she's going to stop her job or what sort of -- sort of work is required. I think that there is a sort of improvisation in response to the Court's question that is not an actual thought-out plan for what would happen to his business, Your Honor. And I don't know one way or the another whether she would agree to that. But I don't think they met their burden to show that, you know, she -- that, you know, the plan involving her or hiring somebody else is adequate to meet the Court's concerns in this instance.

And then, finally, you know, Your Honor, I heard the -- the description of Ms. Mansfield, who is here. You know, I think Mr. Brown described her as she's 81 years old, and also, notably, I think he described Mr. Faircloth as her caretaker when he's in San Antonio.

Your Honor, I think the Court should satisfy itself that -- that if she is the person that, you know, he is going to be living with, is going to be monitoring -- the primary person monitoring his compliance in this instance because she's going to be right there and she's going to know, kind of, his activities in private, how is he doing? Is he angry? Does he look like he's, you know, getting ready to lash out again? All of these other things are the sorts of things that he might not

show, you know, someone at a business event but you can see in the privacy of his own space when he's alone.  For example, like in that storage unit.  I think the Court should satisfy itself that Ms. Mansfield isn't an adequate person to carry out that task, because I think it is very, very important in this case.

This is case, Your Honor, where the presumption does real work, because I think that what Congress has done in 3142 is give the Court a starting point in assessing risk.  I think that we -- nobody can predict the future and say something is definitely going to happen or not going to happen, but is a question of risk.

And I think the starting point is that he is too risky to be let out in public.  There is nothing that the defendant has done to show -- to provide sufficient evidence that there are conditions or a combination of conditions that would ensure the safety of the public and that he is not a flight risk.  Thank you.

THE COURT:  Thank you, Mr. Srinivasan.

So, at this time the court will take a brief recess. I understand it's a little bit late in the afternoon, but it will -- if anyone needs to make their plans, it will probably be 10 or 15 minutes while I recess to my chambers and consider the evidence that I've seen.  And I'll ask pretrial to meet me in there.  So I'll return at approximately 4:30.

We're in recess.

(Recess from 4:15 to 4:38 p.m.)

THE COURT:  So I want to begin the conclusion here this afternoon by thanking counsel for their very able arguments, Mr. Srinivasan and Mr. Brown, and to point out that this is an extremely difficult case.  And I'll review a few of the general principles that -- that counsel are well aware of but Mr. Faircloth likely is not.

So in considering the government's request to detain you, the courts are guided by several general principles. First is that you're entitled to a presumption of innocence at all times, and under the Bail Reform Act, pretrial detention is an exceptional step.  A defendant is to be released before trial unless I find that there is no condition or combination of conditions that will reasonably assure the appearance of the defendant, because the government contends that you're a flight risk.  And also because you are -- the government contends that you're a danger to the community, in order to detain you, I would have to find that there's no condition or combination conditions that could reasonably assure the safety of any other person in the community.

The act, the Bail Reform Act, that is, requires that the least restrictive conditions be imposed that are necessary to provide these assurances.  And if I can't find any condition or combination of conditions that will reasonably assure your

appearance as required or the safety of the community, then I'm required by the Bail Reform Act to hold you in custody, Mr. Faircloth.

So, as Mr. Srinivasan mentioned, there is a rebuttable presumption in your case that detention is needed, because you're charged with a crime.  And I don't believe you said this word, Mr. Srinivasan, but I think it fairly characterizes the crime you're charged with is an act of terrorism.  Is that correct, Mr. Srinivasan?

MR. SRINIVASAN:  Your Honor, I just want to be careful about --

THE COURT:  Certainly.

MR. SRINIVASAN:  -- particular words and the office making decision.  I think that the statutory cite there from 2332 in that definition, but it's the second part of the definition and it's just an enumerated offense there that's referred in 3142.  That's why I just -- I want to be careful about these things.

THE COURT:  I do want you to be careful, and I appreciate that.  That's why I turned to you, Mr. Srinivasan.

So, although there the rebuttable presumption applies, under the statute that Mr. Srinivasan has alluded to, which is 3142(e)(3)(C), I find that you have offered evidence sufficient to rebut that presumption.  And the -- the Act -- I'm going to state the reasons why I find that you have

rebutted the presumption by going into consideration of the factors that Mr. Brown summarized under the Bail Reform Act.

So the presumption remains a factor to be considered, but when you consider the nature and circumstances of your alleged offense, Mr. Faircloth, the weight of evidence against you, and the nature and seriousness of the dangers to others or the community, those factors I find do all weigh in favor of detention. But the reason I find that you've rebutted the presumption is the third factor, which considers several history and characteristics that you have, Mr. Faircloth.

And, in particular, these two hours that we've been focused on, for the last hour and a half or almost two hours this afternoon, are deeply troubling and present a significant risk to the community. But my assessment of all the evidence before me today is that those two hours aren't reflective of your life to this point, Mr. Faircloth and, hopefully, will not be of your life on release and going forward.

Those particular history and characteristics, Mr. Brown mentioned some of them, your family ties, your record of employment, your length in the community. And I think those are primarily the ones that apply. Several of the others don't apply to you as he mentioned. But for these reasons I find that you can -- there are conditions, and a combination of conditions, in particular, that I can set that will assure your appearance as required and ensure the safety of the community.

But I'm going to go through those, and there are a quite a few conditions and it will take a little while, and I want to make sure that you understand, Mr. Faircloth, the extreme importance of abiding by these conditions.

And I'll start by letting you know that, if you violate any of the conditions of your bond, a warrant can be issued for your arrest, you can be placed in jail.  I'm going to require an appearance bond, which we'll get to in a moment, that would be forfeited.  You can be found in contempt of court.  If you fail to appear for any court appearance, Mr. Faircloth, that's a separate offense that can be punished by up to 15 years in prison, and that's stacked on top of any prison term that may be imposed on you for the underlying offense.  If you commit any new offense while you're on release, that's a federal crime punishable by up to 10 years in prison, also stacked on top of the underlying offense if you get a prison term for that.  And it's a federal crime to contact witnesses, jurors, prosecutors, or otherwise to tamper with evidence or obstruct justice in any way.

So with that said, I'm going to go through and review the particular conditions with you.  Mr. Faircloth, I'm going to impose an appearance bond.  It's a secured bond of $25,000 with $2500 cash deposit.  I'm not going to ask your grandmother to cosign on that.  That will be for you, Mr. Faircloth.

Additional conditions:  You must not violate any

federal, state, or local law while on release.

You must cooperate in the collection of DNA sample if it's authorized by statute.

You have to advise your supervising officer, and I assume you will be supervised out of San Antonio, or the pretrial services office in writing before you make any change of residence or telephone number.  So you'll be living with your grandmother, and you're not allowed to move without advance notice in writing.  And I believe I would also ask that it should be approved by me, that the pretrial services would bring that to me.

You must appear in court as required and, if convicted, must surrender as directed to serve a sentence that may be imposed here in Austin.

You need to continue with your employment.

And very important that you surrender your passport.  And that's located in your storage unit, correct?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  So, Mr. Faircloth, you won't be released until the bond is in place, and the passport should be surrendered at the same time.

You're not to obtain a new passport or any other international travel document.

Now, I have gone with the recommendation of pretrial services, which also recommended release in your case, that

your travel will be restricted to Bexar County. And, in fact, it does have here the surrounding counties, and I'm limiting it to Bexar County. So I understand that that may have an impact on your work, but that's -- that's a condition, is that you stay in Bexar County. Any other travel has -- will need to be approved through pretrial services or through the court.

I'm -- before you ask, I'm disinclined to allow you to travel for work purposes, so it will be limited to Bexar County. And Mr. Brown said there may be other -- if you have other people pursue your business other places, that's not part of the conditions, but you yourself are limited to Bexar County.

You may travel here for court-related matters. No foreign travel.

You need to avoid any contact, directly or indirectly, with any victims or witnesses.

You don't own any guns, correct, Mr. Faircloth?

THE DEFENDANT: No, ma'am.

THE COURT: And you've said previously there are none in your grandmother's house?

THE DEFENDANT: No, ma'am.

THE COURT: You may not own any firearm, destructive device, or other weapon. And pretrial asks that that include -- I clarify that includes fireworks.

You're not to use alcohol excessively and not use or

unlawfully possess a narcotic drug.  And, just to be clear, whatever the law is in certain states, that's -- I see that you have had a habit of marijuana use.  That's not permitted.

THE DEFENDANT:  Okay.

THE COURT:  That would result in a revocation of your conditions of release.  You may not use any cannabinoids.

You have to submit to testing if required by pretrial services.  If directed, participate in the program of inpatient or outpatient substance abuse therapy and counseling.

And I have set a curfew condition with GPS monitoring.  That would be a curfew in your residence from -- or your grandmother's house from 10:00 p.m. to 7 a.m. daily. So he needs to be there and, that will be monitored electronically.

Pretrial had a -- wanted to address that?

MR. GOSSER:  Did you want that monitor strapped on today or you wanted to --

THE COURT:  I don't believe Mr. Faircloth is being released today.  He's going to have to put the -- have the --

MR. BROWN:  Money and the passport.

THE COURT:  -- passport retrieved, yes.  The money and the passport, as his attorney succinctly said.  So at the time he is released, then that would be affixed.

Report as soon as possible to pretrial services or the supervising officer of any contact with law enforcement.

That includes any form of contact: questioning, arrests, traffic stops, anything like that.  Anything at all, in fact, you need to report to pretrial services.

And, I have the requirement based on the incident with your mother, you need to participate in and successfully complete an online anger management class, as directed by pretrial services and provide proof of the same.

So, given the -- the importance of these conditions of release and how close a decision I found this, Mr. Faircloth, do you or Mr. Brown have any questions whatsoever about any of these conditions?  Is there anything that you think you can't abide by?

MR. BROWN:  Judge, there is those state cases pending, and I'm not sure what the court dates are.  I don't represent him on those.  There's a court-appointed attorney.  And so he is going to need to travel for that.  And they're out of the same transaction.

THE COURT:  The travel condition states that you may travel to Travis County for court-related matters.

MR. BROWN:  Okay.  Thank you, Judge.

THE COURT:  And that includes any of your court-related matters.

MR. BROWN:  Okay.

THE COURT:  Is there anything further, Mr. Brown?

MR. BROWN:  Nothing from the defense, Your Honor.

Thank you very much.

THE COURT:  Okay.  Thank you.

Mr. Srinivasan, anything from the government?

MR. SRINIVASAN:  No, Your Honor.

THE COURT:  Okay.  This -- just the last thing before we adjourn, I would just say, Mr. Faircloth, once again, this was a very close case, and I am confident that your life leading up to this point will lead you to be successful on release.  And let me just ask you, sir, do you intend to abide by these conditions fully?

THE DEFENDANT:  Yes, ma'am, I sure do.

THE COURT:  Okay.  Thank you.  Well, I anticipate that I won't see you back here again, and I certainly hope that to be the case.

And, if there's nothing further from counsel?

MR. SRINIVASAN:  Not from the government.  Thank you.

MR. BROWN:  Nothing from the defense, Your Honor.  Thank you.

THE COURT:  And Mr. Ferrell?

THE CLERK:  No, Your Honor.

THE COURT:  Okay.  Thank you.  Then our proceeding is adjourned.

    (Proceedings concluded at 4:50 p.m.)

**REPORTER'S CERTIFICATE**

I, Arlinda Rodriguez, do hereby certify that the foregoing was transcribed from an electronic recording made at the time of the aforesaid proceedings and is a correct transcript, to the best of my ability, made from the proceedings in the above-entitled matter, and that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

/S/ Arlinda Rodriguez                    January 14, 2022

ARLINDA RODRIGUEZ                        DATE

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)